UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON

CIVIL ACTION NO. 12-148-KKC

RONALD MILLS and
MALINDA MILLS                                                           PLAINTIFFS

v.                                  **OPINION & ORDER**

MARK S. RIGGSBEE, *et al.*                                               DEFENDANTS

\* \* \* \* \* \* \* \* \* \* \* \*

Currently before the Court is the motion *in limine* filed by Defendants, Mark S. Riggsbee and Task Force Tips, Inc. (collectively, "Defendants"), to exclude the testimony of Ronald L. Hopkins, CFPS, CFEI, pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137 (1999), and Federal Rule of Evidence 702. Also before the Court is Defendants' motion *in limine* to preclude Hopkins from testifying as to any inspection of the Berea Fire Department fire hose and his opinions regarding the inspection of the hose [DE #75]. These motions are fully briefed and ripe for review.

**I.    FACTUAL AND PROCEDURAL BACKGROUND**

Defendant Task Force Tips is the manufacturer, producer and/or seller of various firefighting equipment, including a device known as the Blitz-Fire Monitor fire hose water regulator. The Blitz-Fire Monitor is a device that sits on the ground and is attached to the end of a fire department fire hose and allows firefighters to fight fires without hand-holding the fire hose. Part of the monitor's design includes an automatic shut-off system.

Plaintiffs contend that Plaintiff Ronald Mills, a firefighter for the City of Berea, was injured on October 13, 2011, when he attended a sales demonstration of the Blitz-Fire Monitor performed

at the Berea Fire Department by Defendant Mark Riggsbee. For purposes of the demonstration, the monitor was attached to a fire hose attached to a Berea Fire Department pumper truck. During the demonstration, the fire hose came loose from the pumper truck, knocking Mills off his feet and causing him injury. Plaintiffs claim that the fire hose detached from the truck because of "water hammer," a condition that the monitor was supposed to eliminate. "Water hammer" occurs from the back flow of water when a fire hose is shut off too quickly, causing a build-up of pressure. Defendants deny that water hammer occurred and instead claim that the accident was caused by a faulty fire hose.

Plaintiffs have named Hopkins as an expert expected to testify in this matter. According to Plaintiffs, Hopkins will testify that the fire hose separated from the pumper truck due to water hammer. Hopkins will also testify that the fire hose used during the demonstration was not defective. Defendants have filed this motion seeking to exclude Hopkins' testimony on the grounds that Hopkins' opinions are not scientifically reliable and, therefore, must be excluded from trial. A hearing on Defendants' motion was held on November 15, 2013. Plaintiffs did not offer Hopkins as a witness, nor did Hopkins otherwise attend the hearing.

**II.     STANDARD**

In *Daubert*, the Supreme Court "established guidelines for district courts to use in determining the admissibility of expert testimony pursuant to Rules 702 and 104 of the Federal Rules of Evidence." *Pride v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir. 2000). *Daubert* applies to "scientific," "technical" and "otherwise specialized" knowledge. *Kumho Tire Co.*, 526 U.S. at 141. "Although...the evaluation of expert testimony is generally left to juries, the Court emphasized the trial judge's 'gatekeeping' role with respect to expert proof...." *Pride*, 218 F.3d at 577 (citing

*Daubert*, 509 U.S. at 597–98). The Federal Rules of Evidence provide that an expert who is qualified:

> by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> © the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed.R.Evid. 702.

A proposed expert witness "must first establish his expertise by reference to 'knowledge, skill, experience, training, or education.'" *Pride*, 218 F.3d at 577 (quoting Fed.R.Evid. 702). Next, the testimony must assist the trier of fact and "must 'fit' the facts of the case, that is, there must be a connection between the scientific research or test being offered and the disputed factual issues in the case." *Id*. (citing *Daubert*, 509 U.S. at 592). The district court's function as a gatekeeper is "to determine whether the principles and methodology underlying the testimony itself are valid," *United States v. Bonds*, 12 F.3d 540, 556 (6th Cir.1993), "not to second guess the validity of conclusions generated by otherwise valid methods, principles, and reasoning." *Pride*, 218 F.3d at 577; *see also Daubert*, 509 U.S. at 595 (emphasizing that the focus of the inquiry "must be solely on principles and methodology, not on the conclusions that they generate.").

A Rule 702 inquiry is "a flexible one." *Daubert*, 509 U.S. at 594; *see also Kumho Tire Co.*, 526 U.S. at 152 ("[T]he trial judge must have considerable leeway in deciding in a particular case

how to go about determining whether particular expert testimony is reliable."). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" are still available to the opposing party to attack "shaky but admissible evidence." *Daubert*, 509 U.S. at 596. "[M]ere weakness in the factual basis of an expert witness' opinion bear[s] on the weight of the evidence rather than its admissibility." *McClean v. Ontario, LTD.*, 224 F.3d 797, 801 (6th Cir.2000). The party proffering the expert testimony must demonstrate by a preponderance of proof that the potential expert witness meets requirements discussed above. *Pride*, 218 F.3d at 578 (citing *Daubert*, 509 at 592 n. 10).

"Red flags that caution against certifying an expert include reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity." *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012)(citing *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 177 (6th Cir. 2009)). The fact that a purported expert's opinion was prepared solely for litigation may also be considered as a basis for exclusion. *Id.*, citing *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 434 (6th Cir. 2007). Nevertheless, "[t]he Rules' basic standard of relevance...is a liberal one." *Daubert*, 509 U.S. at 587, and the trial court's gatekeeping role does not permit it to reject admissible expert testimony.

### III. ANALYSIS

In order for Hopkins to be permitted to testify in the form of an opinion as an expert witness, Hopkins must first qualify as an expert under Rule 702. Although Plaintiffs point out that Hopkins' qualifications have not been challenged, Plaintiffs overlook that part of the Court's "gatekeeping" role under *Daubert* is to ensure that the proposed expert is qualified to render his or her offered opinion. "To qualify as an expert under Rule 702, a witness must first establish his expertise by

reference to 'knowledge, skill, experience, training or education.'" *Pride*, 218 F.3d at 577(quoting Fed. R. Evid. 702). Although this requirement is treated liberally, this liberal interpretation "does not mean that a witness is an expert simply because he claims to be." *Id.* (quoting *In re Paoli RR Yard PCB Litigation*, 916 F.2d 829, 855 (3d Cir. 1990)).

Here, Plaintiffs have presented no evidence as to Hopkins' qualifications. Plaintiffs' response to Defendants' *Daubert* motion briefly summarizes Hopkins' purported qualifications and makes reference to Hopkins' "106-page *curriculum vitae*" that it states is attached to the response.[1] However, Hopkins' CV is not attached to Plaintiffs' response, nor has a copy of Hopkins' CV otherwise been submitted to the Court. Plaintiffs' failure to attach a copy of Hopkins' CV is particularly surprising considering that, due to Plaintiffs' failure to attach other exhibits to their response, the Court specifically entered an Order directing Plaintiffs to file any exhibits referenced in their response to Defendants' *Daubert* motion and other motions [DE #70]. This Order clearly states, in bold-face type: "**Any evidence on which Plaintiffs' intend to rely must be provided to the Court for consideration**." Although Plaintiffs' did supplement their response by filing the other exhibits, a copy of Hopkins' CV was not among the exhibits filed. Moreover, Hopkins did not attend the *Daubert* hearing, a hearing held with the specific purpose of determining whether Hopkins would be permitted to testify. Thus, Plaintiffs presented no testimony at the hearing regarding Hopkins' qualifications. Accordingly, notwithstanding the requirement that a party proffering expert

---

[1]Plaintiffs' response states that Hopkins has been an Associate Professor in Fire and Safety Engineering Technology at Eastern Kentucky University for 31-years, has served as an Adjunct Instruction in Kentucky Fire and Rescue Training, has "decades" of experience as a fire fighter, has spoken at meetings and seminars concerning fire fighting and fire safety issues, has published "numerous professional and scholarly" articles and was selected as "Man of the Year' by the National Association of Fire Investigators in 1987.

testimony must show by a "preponderance of proof" that the expert whose testimony is being offered is qualified, *Pride*, 218 F.3d at 578, Plaintiffs have failed to put forth any proof, much less a preponderance, of Hopkins' qualifications. Indeed, there is simply no evidence before the Court that would permit it to find that Hopkins is, in fact, qualified to render an expert opinion.

Moreover, even if Hopkins is qualified as an expert, Plaintiffs must also show that Hopkins' testimony will assist the trier of fact to understand the evidence or determine a fact in issue. Here, determining whether Hopkins' testimony would be helpful to the jury is complicated somewhat due to Plaintiffs' ever-changing theory of the case. Plaintiffs initially pursued this case as primarily a products liability case, bringing claims for negligence, negligent design and/or manufacture, selling and/or demonstrating the monitor in a defective condition, unreasonably dangerous to the users thereof, breach of express and implied warranty of merchantability and fitness for a particular purpose and failure to warn. However, after Plaintiffs' breach of warranty claims were dismissed on Defendants' motion for summary judgment, Plaintiffs completely abandoned the remaining products liability claims. At the *Daubert* hearing, Plaintiffs repeatedly insisted that this case was only about negligence, specifically whether Riggsbee negligently continued the demonstration of the Blitz-Fire Monitor after the first water hammer allegedly occurred. Plaintiffs' counsel even criticized Defendants for "turning a negligence case into a products liability case," conveniently ignoring that Plaintiffs filed the case as a products liability case.[2]

---

[2]Plaintiffs' circular logic at the hearing was, at times, difficult to follow. For example, Plaintiffs claimed that they did not need to prove causation at trial because it does not matter why the accident occurred; however, the next moment, Plaintiffs' counsel argued that Plaintiffs needed testimony from their expert to show causation.

Regardless of Plaintiff's efforts to muddy the waters, Plaintiffs have failed to establish that Hopkins' proffered opinion testimony would assist the trier of fact. Plaintiffs argue that Hopkins' testimony will help the jury understand the events captured by the Berea Fire Department's security cameras on the day of the accident. Specifically, Plaintiffs state that a video recording that Plaintiff and his daughter made of the security footage shows that the fire hose "jumps" prior to the accident. According to Plaintiffs, Hopkins will testify that this "jump" is a result of water hammer. However, this "video of a video" recording of the security footage has its own problems. The Court has already found that the video is inadmissible as its limited probative value is greatly outweighed by the significant risk of unfair prejudice, confusing the issues and misleading the jury that would result from introducing this video as evidence [DE #104]. Thus, since the video is not admissible, Hopkins' testimony is not needed to explain to the jury what is being seen on the video.

Moreover, even if the video were admissible and the Court found that Hopkins' testimony would be helpful to the jury, Plaintiffs fail to articulate the specific facts or data upon which Hopkins' conclusions that water hammer occurred and that this water hammer caused the hose to detach from the coupling is based, or the principles or methods applied by Hopkins in reaching these conclusions. Plaintiffs candidly admit that Hopkins did not perform any testing on either the BlitzFire Monitor or the water hose. Indeed, as discussed more fully below, Hopkins did not even examine the hose until well after opining in his expert report that he did not believe that the hose was defective. According to Plaintiffs, Hopkins' opinions that the hose separated from the coupling because of water hammer are based on his review of the eyewitness accounts of the accident, as well as the aforementioned video. However, Plaintiffs fail to identify anything specific that Hopkins learned from his review of the eyewitness accounts or saw in the video that led Hopkins to conclude

that a water hammer occurred, other than that the hose jumped. At the hearing, Plaintiffs' counsel conceded that hoses can jump and jerk for other reasons. However, Plaintiffs fail to articulate what, specifically, Hopkins saw in this video or learned from his review of the eyewitness accounts that led him to conclude that this particular jump was different and how that difference indicates that this jump was caused by water hammer.

Nor is there any explanation *at all* about how Hopkins applied his expertise in reaching his conclusion that water hammer caused the hose to jump. For example, Plaintiffs have identified no principles or methods used by Hopkins to determine that the hose jumped due to water hammer. Although there is a vague reference to the "scientific method" in Hopkins' report, there is no explanation of how *any* method - scientific or otherwise - was applied by Hopkins in this case. Indeed, when Hopkins was specifically asked about the scientific testing in his deposition, he claimed to have done "cognitive testing" to confirm his hypothesis, testifying as follows:

> Q. In this case, on page 4 of your report, where it talks about, in section 2, "The event that caused the fire hose to separate from the coupling was two consecutive water hammers developed as a result of the functioning of the safety shut off valve in rapid succession during the product demonstration of the Blitzfire Portable Monitor at Berea Fire Department," what testing did you do for that hypothesis to confirm your hypothesis was correct?
>
> A. I reviewed the videotape. And in looking at the videotape, the – surveillance videotape, you can see the monitor activate and then it's off and then it's turned back on and water flows and then it's off.
>
> At the first shutoff of the monitor, one of the firefighters turns his head and looks back at the demonstration. I believe that what that firefighter did was he picked up on the change in the sound of the engine, where the pressure went up, and looked back to see what was going on.
>
> And then the demonstration started again very quickly. And then the second time it was shut off, several of them ran from where the demonstration was taking

place immediately through the bay to where the apparatus was. And then a few seconds later or a little delay after that, two people show up.

So thinking about what changed. When the – when the water was flowing, everything was fine. When the nozzle was shut off, it shut off fast enough that the relief valve didn't react and so the pressure went up. Not uncommon.

When the nozzle is opened back up, the pressure returns to where it was originally set. The reactivation of that, I don't know that all of – because we don't have any video of the gauges. I don't know whether it had actually gone all the way back down to the 150 or it was somewheres [sic] in between, but the nozzle was immediately shut off again, and that's when the hose came apart and Mr. Mills was struck by the hose and by the water.

Q. Well, what you're telling me are the events that were shown on a video and/or what people may have testified to in depositions. You haven't told me what testing you've done to confirm your hypothesis of your opinion that what caused this fire hose to separate from the coupling was these two consecutive water hammers.

A. I believe I did.

Q. No, you didn't. What testing did you do?

A. What was the change.

Q. I realize you're saying A plus B equals C, but that's not testing.

A. It's cognitive testing.

[DE #80-1].

However, this response offers no real insight into the analysis done by Hopkins in reaching his conclusion that water hammer occurred, causing the accident. With no connection between some kind of analysis and Hopkins' conclusions, there is nothing to support Hopkins' opinion. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). As recognized by the Supreme Court, "[a] court may conclude that there

is simply too great an analytical gap between the data and the opinion proferred." *Id*. Here, the lack of evidence of any sort of analysis by Hopkins results in a complete gap between the data and the opinion proferred by Hopkins. There is simply no information before the Court explaining how Hopkins got from "point A" (the hose jumped) to "point B" (therefore water hammer must have occurred). Instead of filling in this gap with further information about Hopkins' analysis or his methodology, Plaintiffs' counsel offers nothing more substantive than Hopkins will testify that the hose jumped because of water hammer; he knew it was water hammer because the hose jumped. This Court cannot permit a witness to offer an "expert" opinion based on nothing more than circular logic. Accordingly, Hopkins' testimony is inadmissible.

According to Plaintiffs, to counter Defendants argument that the accident was caused by a faulty fire hose, Hopkins will also testify that the fire hose used during the demonstration of the Blitz-Fire Monitor was not defective. However, Plaintiffs again fail to show that Hopkins' opinions on the hose are based on sufficient facts or data, or are the product of reliable principles and methods that Hopkins has reliably applied to the facts in this case. Plaintiffs admit that Hopkins rendered his opinion on the hose in his April 17, 2013 report without ever inspecting the hose or doing any sort of testing of the hose. In his report, Hopkins states:

> At this time, I have not had an opportunity to personally inspect the fire hose that was utilized during the Blitzfire Monitor demonstration on the date of the incident. However, based on the testimony that I have reviewed, I do not believe that the hose was defective. The fire hose had been successfully pressure tested prior to the date of the Blitzfire demonstration. The fire hose had been marked with a felt tip pen in order to rule out slippage of the hose from the coupling during pressure testing and the fact that it remained in service after such testing suggests that there were no problems noted with the hose. This is corroborated by the testimony of the Berea Fire Department, Fire Fighters.

[DE #50-2].

However, Plaintiffs make no showing that Hopkins' reliance on the testing of the hose done by the Fire Department was reasonable. There is no evidence that Hopkins evaluated whether the tests performed by the Berea Fire Department complied with the requirements of the manufacturer or the National Fire Protection Association. Indeed, according to Defendants, the Test Record sheet for the Berea Fire Department for this hose shows that the hose was being tested at 300 PSI, rather than the required 400 PSI. Regardless, "[t]he task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *In re Scrap Metal Antitrust Litigation*, 527 F.3d 517, 529 (6th Cir. 2008). Here, Plaintiffs have made no showing that the testing performed by the Berea Fire Department, which is the basis of Hopkins' disclosed opinions of the hose, is reliable or accurate. Moreover, Hopkins' report makes clear that his opinion is based on his speculation that, because the hose remained in service after the testing, there must not have been any problems with it. "'[N]o matter how good' experts' 'credentials' may be, they are 'not permitted to speculate.'" *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671 (6th Cir. 2010)(quoting *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1088 (10th Cir. 2000)).

Plaintiffs further attempt to argue that, in essence, Hopkins' failure to inspect the hose prior to opining as to whether it was defective was "cured," as Hopkins did inspect the hose after he drafted the report and his inspection did not change his opinion. In accordance with the Court's orders, Hopkins was disclosed as an expert witness for Plaintiffs on or around April 18, 2013 [DE #35]. In his April 17, 2013 report, Hopkins states that, for reasons that are not disclosed, he had not had an opportunity to personally inspect the fire hose, but that, in his opinion, it was not defective. In Hopkins' July 23, 2013 discovery deposition, Hopkins disclosed for the first time that he had

inspected the hose on May 13, 2013.  However, there is no evidence in the record that Hopkins supplemented his April 18, 2013 report or that Plaintiffs disclosed any rebuttal expert witness opinions of Hopkins in compliance with the May 20, 2013 deadline set by the Court, to reflect any inspection of the hose by Hopkins and any opinions or analysis regarding that inspection.

Even if Plaintiffs had shown that Hopkins was qualified to render an opinion regarding the quality of the fire hose and that Hopkins' opinion was based on sufficient facts or data and was the product of reliable principles and methods, Defendants argue that his opinions deriving from his inspection of the fire hose should be excluded because they were not timely disclosed in accordance with the Court's discovery orders.  To the extent that Hopkins' opinion is based on his own examination of the hose, Fed. R. Civ. Pro. 26(a)(2) requires this basis for his opinion be timely disclosed, either in Hopkins' written report or, at the very least, in a rebuttal report. Fed. R. Civ. Pro. 26(2).  However, here, the disclosure of Hopkins' inspection of the hose did not occur until over three months after Plaintiffs' disclosed Hopkins' written report and over two months after the Court's deadline to identify rebuttal expert witnesses. Moreover, although Rule 26(e) imposes a duty to supplement previous disclosures, Plaintiffs did not disclose the fact that Hopkins' inspection of the hose provided additional grounds for his expert opinion until his deposition.  This is simply too little, too late.

Under Rule 37(c)(1), a party failing to provide information or identify a witness required by Rule 26(a) or (e) is precluded from using that information or witness to supply evidence at trial, unless the failure was substantially justified or harmless.  Essentially, this rule "mandates that a trial court punish a party for discovery violation in connection with Rule 26 unless the violation was harmless or is substantially justified." *Roberts ex rel. Johnson v. Galen of Virginia, Inc.*, 325 F.3d

776, 782 (6th Cir. 2003). Here, Plaintiffs have not provided any justification for failing to timely disclose Hopkins' inspection of the hose, nor have Plaintiffs provided any explanation regarding why Hopkins was unable to inspect the hose prior to issuing his expert report. The original expert disclosure deadline was extended by two weeks, pursuant to the parties' joint request [DE #32, 33]. However, Plaintiffs sought no other relief from the Court suggesting that more time may be needed for expert disclosures. Moreover, the Court cannot conclude that Plaintiffs violation was harmless, as, by waiting until Hopkins deposition to disclose his inspection of the hose, Plaintiffs essentially deprived Defendants of the opportunity to effectively prepare to question Hopkins regarding his inspection in his deposition. Under these circumstances, the Court concludes that exclusion of evidence derived from Hopkins' inspection of the hose is warranted. Thus, as there is no basis for Hopkins' opinion that the hose was not defective, Hopkins will not be permitted to offer this testimony at trial.

## IV. CONCLUSION

For the reasons set forth above, the Court, being fully and sufficiently advised, hereby **ORDERS** as follows:

(1) Defendants' motion *in limine* to exclude the testimony of Ronald L. Hopkins, CFPS, CFEI, [DE #50] is **GRANTED**; and

(2) Defendants' motion *in limine* to preclude Hopkins from testifying as to any inspection of the Berea Fire Department fire hose and his opinions regarding the inspection of the hose [DE #75] is **GRANTED**.

This March 20, 2014.

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY